OPINION
{¶ 1} Plaintiffs-appellants Wanner Metal Worx, Inc. and DelawareMachine Worx, Inc. (hereinafter "Wanner") appeal the September 9, 2002Judgment Entry of the Delaware County Court of Common Pleas which grantedsummary judgment against them and in favor of defendant-appelleeHylant-Maclean, Inc (hereinafter "Hylant").
 Statement of the facts and case {¶ 2} On October 16, 1999, one of Wanner's plant facilities wasdamaged by fire. At the time of the fire, Wanner was covered by acommercial insurance policy issued by CNA. The policy included businessinterruption coverage in the amount of 1.9 million dollars. The policyalso contained a 100% co-insurance provision. The policy did not containan agreed value endorsement.
 {¶ 3} Wanner purchased the policy from its insurance broker,Hylant. Wanner had done business with Hylant since 1994, each yearpurchasing similar policies. Wanner's account had always been handled byCraig Markos. By the time of the fire, Markos was the president ofHylant.
 {¶ 4} As a result of the fire, Wanner suffered business losses inthe amount of $1,136,364.00. However, due to the coinsurance provision inthe policy, CNA would pay only $750,000.00. On October 4, 2001, Wannerfiled a complaint against Hylant alleging Hylant negligently failed toobtain an agreed value endorsement negating the coinsurance provision;Hylant negligently failed to advise Wanner an agreed value endorsementshould be obtained; and Hylant failed to properly advise Wanner of theimpact of the coinsurance clause without an agreed value endorsement.
 Business interruption insurance generally provides coverage for lost"business income," and generally includes such items as the net profitswhich would have been earned but the for the suspension of businessoperations, as well as those continuing normal operating expenses incurredduring the period of any suspension. Coinsurance clauses are alsostandard provisions in business property policies. Apparently, thepurpose behind the coinsurance provision is to assure the limit ofinsurance requested by the insured is accurate, and the insured does notunderinsure the business. If the value of the company is underinsured,the coinsurance provision adjusts the payout of the claim in order totake into account the undervaluation of the company. Marcos testified acoinsurance clause would not come into play if the insured properlyvalues the company and insures it accordingly.
 {¶ 5} However, this coinsurance "penalty" can be avoided byobtaining an agreed value endorsement from the insurance carrier. Anagreed value endorsement will only be issued after an underwriterreceives and reviews a business income worksheet documenting thebusiness' income. After an underwriter has received properdocumentation, the insurance company will issue an agreed valueendorsement which eliminates the coinsurance cause. Generally, a businessincome coverage worksheet must be completed each year and submitted tothe agent, who then must submit it to the carrier.
 Markos acknowledged decisions about coinsurance and agreed valueendorsements are important decisions for clients like appellants. Duringdepositions, Markos testified he discussed the subject of coinsurance andagreed value endorsements with both Craig Wanner, the president ofWanner, and Jeff Dix, Wanner's designated contact for insurance issues.Markos claims these discussions occurred at every year during the annualpolicy renewal period, however Markos also testified he had neitherspecific nor general recollection of what was discussed on any particularoccasion.
 {¶ 6} Craig Wanner testified Markos never discussed coinsurance oragreed value endorsements with him as such provisions related to businessinterruption coverage. Wanner testified that as of the date of hisdeposition, he still did not understand how coinsurance worked. Dix didnot deny that any such discussions may have occurred with Markos, but hecould not recall a specific conversation.
 {¶ 7} Markos admitted Wanner and Dix asked him on more than oneoccasion to explain coinsurance. Further, Theresa Gallo, a customerservice representative at Hylant who assisted Markos with the Wanneraccount, testified Dix had asked her for definition of coinsurance.Although Gallo has been a licensed property and casualty insurance agentfor more than twelve years, she testified she did not know the definitionof coinsurance, and had to ask Markos to explain it to her. After thisexplanation, she still did not understand the definition.
 Even though there was confusion about the issue, appellee neverrecommended to Wanner that it remove the coinsurance provision in itsbusiness interruption coverage through the use of an agreed valueendorsement or otherwise. Markos testified it was neither his norHylant's practice to advise customers whether they should havecoinsurance provisions or agreed value endorsement in their policies.Markos testified he did not advise commercial customers as to whetherinsurance coverages were adequate or inadequate for their businesses.Rather, it was Markos' standard practice to advise a client as to whatcoverages were available and then let the client decide what amounts andkinds of coverage they wanted. Markos testified he followed this policywith the Wanner account. At no time did Markos believe it was his duty toadvise commercial customers as to the coverage limits they should havefor their coverages.
 {¶ 8} However, earlier in the relationship, Markos did counselWanner not to decrease the amount of business interruption coverage. Inorder to save money on the premium, Wanner requested a downward deviationin business interruption coverage from $600,000 to $300,000. Markostestified he convinced Wanner this was not a good idea.
 {¶ 9} Markos advised Dix a business interruption worksheet was tobe completed each year for purposes of seeking an agreed valueendorsement and for verifying the accuracy of the coverage limit beingrequested by Wanner. Dix testified that Markos did ask for completedbusiness income worksheets on various occasions, and that thoseworksheets were needed to verify and/or arrive at the correct limit ofbusiness interruption insurance coverage. Although appellee requestedcompletion of the business worksheets on a yearly basis, and followed upwith Wanner about the worksheets, Hylant never received a completedbusiness worksheet from appellee after August of 1995.
 {¶ 10} Joseph Urquhart, a vice president of Berwanger ObermyerAssoc., testified Hylant's failure to recommend Wanner remove thecoinsurance penalty provision in its business interruption coveragethrough the use of an agreed value endorsement or other similarprovision, fell below the standard of care applicable to insurance agentswho advise commercial clients concerning their coverage.
 Beginning with the November 1, 1995, through November 1, 1996 policyperiod, Wanner increased its business coverage from $600,000 to $1.9million. The coinsurance penalty percentage also increased, from 50% to100%. Markos testified he was following his client's request as set forthon a Business Interruption Worksheet signed by Dix on Wanner's behalf.The worksheet indicated Wanner wanted coverage totaling $1.9 million.Below the business interruption value of $1.9 million, the worksheet hadvarious provisions stating as follows:
 {¶ 11} "* * * J. Amount of insurance-item 1. Take 80% or 100% ofcolumn one, column two, depending upon percentage contribution clause tobe used."
 {¶ 12} Jeff Dix wrote the number 100% in the space provided.Wanner argues this 100% notation did not mean that appellants wanted 100%coinsurance but instead wanted an amount of insurance totaling 100%.
 {¶ 13} Further, Craig Wanner testified he wanted 100% insuranceand he wanted to be entirely covered for any potential loss. Wanner alsoargued it relied on appellee to advise it if it was not fully insured.Wanner testified specifically he relied upon Markos to let him know if hewasn't getting any information from Dix or if once he had theinformation, if he had any large exposure.
 {¶ 14} Wanner changed its carrier to CNA on January 1, 1999. Justas in the past years, appellants requested business interruption coveragein the amount of $1.9 million with 100% coinsurance. Markos completedthis application based upon Dix telling him leave all coverages andlimits in place "as is." Markos testified he again requested appellantscomplete a business income worksheet and Dix instructed he did not wantto change the business income coverage limits. Appellee sent Dix a newbusiness income worksheet to be completed, but it was never returned.
 The CNA policy was forwarded to appellants on August 26, 1999. The CNApolicy explained the coinsurance provisions of the business incomecoverage. The coinsurance in the CNA policy included definitions, anddetailed explanations, including examples of how coinsurance would workwith adequate and inadequate coverage limits. The parties do not disputeappellants received this policy prior to the fire.
 {¶ 15} Dix received insurance binders with attached summaries ofcoverage from appellee at the inception of each policy period. Howeverneither Craig Wanner nor Dix, nor anyone at Wanner ever read or reviewedthe policies or binders. They did read the proposals and summaries ofcoverage. Both Craig Wanner and Dix testified these summaries appeared tocontain language negating the existence of coinsurance. The proposals andsummaries each contained a page describing appellants' business incomecoverage. On each of these forms, appellee stated appellants not only hadcoverage totaling $1.9 million with 100% coinsurance, but also stated the"valuation" for the $1.9 million in coverage was the "actual losssustained."
 {¶ 16} Markos did not recall ever explaining to appellants what"actual loss sustained" meant. Craig Wanner testified he understoodactual loss sustained to mean he had business interruption coverage,dollar for dollar, for the actual loss sustained up to $1.9 million.
 {¶ 17} Hylant filed its motion for summary judgment claiming itadvised Wanner as to the coverage available and left to Wanner thedecision as to what coverage to purchase. Hylant asserted the policyclearly set forth the impact of the coinsurance clause, therefore, itcould not be blamed for appellants' failure to read and understand thecontents of its insurance policy.
 {¶ 18} Wanner presented Urquhart's affidavit opining appellee'sfailure to provide an agreed value endorsement fell below the standard ofcare.
 Appellants also argued genuine issues of material fact remained as towhether Hylant obtained the coverage Wanner actually requested. In hisdeposition, Craig Wanner stated he thought he had $1.9 million incoverage, regardless of any coinsurance provision. Wanner also argued theinsurance summaries Hylant provided each year indicated Wanner did have$1.9 million in coverage. Wanner asserted it reasonably interpreted the"actual loss sustained" language to mean in the event of a loss,appellants would be entitled to actual dollar value of the losssustained.
 {¶ 19} In a September 9, 2002 Judgment Entry, the trial courtgranted summary judgment in favor of Hylant, finding the resolution ofthe motion turned upon Wanner's failure to read its policy. It is fromthis judgment entry appellants prosecute their appeal, assigning thefollowing error for our review:
 "I. The trial court erred in concluding that because appellants hadfailed to read their insurance policy, appellants' claims for negligenceagainst appellee were barred as a matter of law, and in granting summaryjudgment to appellee, where: (a) Ohio law requires insurance agents toadvise their customers who are relying on the agent's expertise; (b) itwas undisputed that appellee failed to advise appellants to obtain anagreed value endorsement for their business interruption coverage; (c)there was evidence that appellee's failure to so advise appellants fellbelow the applicable standard of care; (d) there was a genuine issue offact as to whether a relationship of special trust and confidence existedbetween appellants and appellee; (e) there was a genuine issue of fact asto whether appellee had misled appellants about the scope of theinsurance coverage they did have; and (f) appellants suffered damage as aresult."
 I. {¶ 20} In Wanner's sole assignment of error, it maintains thetrial court erred in granting summary judgment against it. Wannercontends there are genuine issues of material fact relative to whetherHylant breached its standard of care in failing to advise appellantsabout agreed value endorsements for business interruption coverage,whether any special relationship of trust and confidence existed betweenWanner and Hylant, and whether Hylant misled appellants about the scopeof insurance coverage it did have. We agree. Summary judgment proceedingspresent the appellate court with the unique opportunity of reviewing theevidence in the same manner as the trial court. Smiddy v. The WeddingParty, Inc.(1987), 30 Ohio St.3d 35, 36.
 {¶ 21} Civ.R. 56(C) states, in pertinent part:
 {¶ 22} "Summary Judgment shall be rendered forthwith if thepleadings, depositions, answers to interrogatories, written admissions,affidavits, transcripts of evidence in the pending case, and writtenstipulations of fact, if any, timely filed in the action, show that thereis no genuine issue as to any material fact and that the moving party isentitled to judgment as a matter of law. . . . A summary judgment shallnot be rendered unless it appears from such evidence or stipulation andonly therefrom, that reasonable minds can come to but one conclusion andthat conclusion is adverse to the party against whom the motion forsummary judgment is made, such party being entitled to have the evidenceor stipulation construed most strongly in his favor."
 Pursuant to the above rule, a trial court may not enter a summaryjudgment if it appears a material fact is genuinely disputed. The partymoving for summary judgment bears the initial burden of informing thetrial court of the basis for its motion and identifying those portions ofthe record that demonstrate the absence of a genuine issue of materialfact. The moving party may not make a conclusory assertion that thenon-moving party has no evidence to prove its case. The moving party mustspecifically point to some evidence which demonstrates the non-movingparty cannot support its claim. If the moving party satisfies thisrequirement, the burden shifts to the non-moving party to set forthspecific facts demonstrating there is a genuine issue of material fact fortrial. Vahila v. Hall(1997), 77 Ohio St.3d 421, 429, citing Dresher v.Burt(1996), 75 Ohio St.3d 280.
 {¶ 23} It is based upon this standard we review appellant'sassignment of error.
 {¶ 24} In its September 9, 2002 Judgment Entry, the trial court'sdecision turned on the fact Wanner failed to read its insurancecontracts. The trial court noted an insurance agent has a duty toexercise good faith and reasonable diligence in undertaking to acquireinsurance coverage. Slovak v. Adams (2000), 141 Ohio App.3d 838, 845. Thetrial court also noted in the absence of a fiduciary relationship, aninsurance sales agency has a duty to exercise good faith in obtainingonly those policies of insurance which its customers request. FirstCatholic Slovak Union v. Buckeye Union Ins. Co. (1986), 27 Ohio App.3d 169.
 The trial court relied on Craggett v. Adell Ins. Agency(1993),92 Ohio App.3d 443, 453, for the proposition an insurance customer has acorresponding duty to examine the coverage provided, and is charged withknowledge of the contents of his or her own insurance policy. Craggettheld an agent or broker is not liable when the customer's loss is due tothe customer's own act or omission. The trial court noted the recordclearly demonstrated 1) Wanner did not read their insurance policy priorto the fire, 2) the insurance policy contained a 100% coinsuranceprovision and explained the application of such provision in the event ofa loss, and 3) the insurance policy stated an agreed value endorsementcould be obtained if the insured completed a business income worksheet.The trial court found if Wanner had read its insurance policy, it wouldhave noted the existence of the coinsurance provision and would have seenthe need for an agreed valued endorsement. Even if Wanner did notunderstand the language of the contract, any misunderstanding would haveprompted inquiry of Hylant. Accordingly, the trial court found the losssustained was a result of appellants' failure to read and understandtheir insurance policy.
 {¶ 25} However, the trial court also found no fiduciaryrelationship existed between appellants and appellee requiring aheightened duty on appellee's part.
 {¶ 26} "When the agency knows that the customer is relying uponits expertise, the agency may have a further duty to exercise reasonablecare in advising the customer." First Catholic Slovak v. Buckeye UnionIns. Co. (1986), 27 Ohio App.3d 169. Id. Thus, an insurance agent mustnot only obtain the insurance requested, but also, advise a customer whois relying on his expertise. Id.; Bedillion v. Tri-County Ins. Agency(Feb. 3, 1993), Summit App. No. 15722, unreported.
 Ordinarily, the relationship between an insured and the agent thatsells the insurance is, without proof of more, an ordinary businessrelationship, not a fiduciary one. Craggett, 92 Ohio App.3d at 452. "A`fiduciary relationship' is one in which special confidence and trust isreposed in the integrity and fidelity of another and there is a resultingposition of superiority or influence, acquired by virtue of this specialtrust." Stone v. Davis(1981), 66 Ohio St.2d 74, 78. A fiduciary's rolemay be assumed by formal appointment or may arise from a more informalconfidential relationship, wherein "one person comes to rely on and trustanother in his important affairs and the relations there involved are notnecessarily legal, but may be moral, social, domestic, or merelypersonal. * * *" Craggett, 92 Ohio App.3d at 451. Such a confidentialrelationship cannot be unilateral, both parties must understand that aspecial trust or confidence has been reposed. Slovakat 838.
 {¶ 27} As an initial matter, we note our disagreement with thegeneral rule set forth in Craggett, Fry,and The Island House Inn, Inc.v. State Auto Ins. Cos. (2002), 150 Ohio App.3d 522, 2002-Ohio-7107.
 {¶ 28} In Craggett, the insured filed a misrepresentation actionagainst an insurance agency. The trial court granted summary judgment infavor of the agency and the insured appealed. The Eighth District heldthe insured had failed to prove the existence of a fiduciaryrelationship. Absent that relationship, her insurance agent had only aduty to exercise good faith in obtaining the insurance policy sherequested. Id. at 453. The Eighth District also found a correspondingduty to examine the coverage provided and charge the insured withknowledge of the contents of his or her own insurance policies. Id.
 {¶ 29} In Fry, a farmer sued his insurance agent for negligentlyfailing to obtain the insurance coverage he requested. When a firedestroyed one of his barn buildings and the contents, the farmer reportedthe loss to his insurance agent and carrier. 141 Ohio App.3d 303, 306.The adjuster estimated the farmer's loss at $85,690.32. However, basedupon the 80% coinsurance clause in the policy, the insurance companyoffered $27,215.25 as the full and final settlement.
 Reviewing the denial of summary judgment, the Sixth District analyzedthe farmer's claim that the insurance agent had breached its duty toexercise reasonable care by failing to advise him of the existence of thecoinsurance clause, and failing to recommend to increase his coverage tooffset the coinsurance. Id. at 310. The Sixth District reiterated that aninsurance agency had a duty to exercise good faith and reasonablediligence in obtaining insurance that a customer requests. Id., citingFirst Catholic Slovak supra, at 170. Further, the appellate court notedthat when an agency knows a customer is relying upon its expertise, theagency may have a further duty to exercise reasonable care in advisingthe customer. Fryat 310. The court then noted that an insurance customerhas a corresponding duty to examine the coverage provided and is chargedwith knowledge of the contents of his or her own insurance policies. Id.citing Craggett, supra.
 {¶ 30} In Fry, the insured could "read and write a little." Id. at307. Further, he had the same insurance agent for forty-seven years.Although Fry asserted he could not inquire about the coinsurance clausebecause he did not understand the policy language and was entirelyunaware it effected his coverage, the Sixth District ultimately concludedFry was charged with the knowledge of the policy. The appellate courtfound there was no evidence Fry had inquired specifically about themeaning of the clause at any time during the numerous years the clausewas in his policy. Id. at 311. The appellate court found absent aspecific inquiry by the insured, the insurance agent had no duty toexplain the coinsurance clause. The appellate court made no finding offiduciary relationship between the parties.
 Finally, in First Catholic Slovak, supra, the Eighth District heldsufficient evidence justified the finding the insurance agency hadprovided exactly the coverage requested by the insureds. In making thisdetermination, the appellate court noted the insured had received andheld repeated policies with the same terms applied in previous years.Therefore, it could not complain the policies did not comply with itsrequests when it made no complaint about the policies. Id. at 171.
 {¶ 31} In its September 9, 2002 Judgment Entry, the trial courtfound in the case sub judice, appellants' loss was a result of its ownfailure to read and understand its insurance policy. Therefore, pursuantto Fry, Slovak, First Catholic Slovak Union, and Craggett appellee cannotbe liable and negligent.
 {¶ 32} While we do not necessarily disagree an insured has acorresponding duty to examine coverage provided and may be charged withthe knowledge of the contents of his insurance policies, we cannot findany such duty or breach thereof completely negates appellants' claim. Todo so would be imposing strict contributory negligence when such is notthe standard in Ohio. For this reason alone, we would reverse the trialcourt's judgment entry.
 However, we also note that we find genuine issues of material fact asthey relate to whether a fiduciary relationship existed. Markos testifiedhe would not advise clients as to the appropriate amounts or types ofcoverages required. Rather, he would describe the coverages available andpermit the client to choose. But, this testimony is inconsistent withMarkos' testimony that during their relationship he convinced appellantsa reduction in overall coverage was not prudent. In essence, Markoscannot be heard to say it was appropriate to encourage his client toincrease coverage in one circumstance and then state he never becameinvolved in a business' decision as to how much coverage was necessary.We find this is a genuine issue of material fact which precludes summaryjudgment on the issue of whether a fiduciary relationship existed. If afiduciary relationship existed, appellee would owe a higher standard,requiring appellee to have further advised appellants in this incidence.
 {¶ 33} We also find an issue of material fact existed as to whatcoverage appellants thought they actually had. Appellants' testimony wasclear when reading the summaries of coverage issued by appellee,appellants believed they had dollar for dollar coverage for the actualloss sustained. Further, unlike Fry, both Wanner and Dix repeatedlyrequested explanations of the coinsurance clause. Because of theconfusion surrounding the definition of coinsurance, we find a genuineissue of material fact exists as to whether appellee provided the actualcoverage requested by appellants', i.e., dollar for dollar coverage for$1.9 million in business interruption coverage.
 {¶ 34} Of course these potential breaches in duty must be weighedagainst appellants' corresponding duty to examine the coverage providedand their understanding of the contents of their own insurance policies.
 {¶ 35} In The Island House Inn, supra, the inn and owner broughtan action against their insurance company and insurance agent after theinsurance company denied their business interruption insurance claim forinterruption caused by a boiler failure at the inn. The trial courtgranted the insurance agent's motion for summary judgement. The SixthDistrict Court of Appeals held the inn and owner failed to request boilerinsurance, and thus the agent did not breach its duty to obtain therequested insurance. Further, the inn and owner breached theircorresponding duty by failing to read the policy, and thus the agent wasnot liable for any breach of duty to advise them of their insuranceneeds. The Island House Inn, Inc. v. State Auto Ins. Cos.50 Ohio App.3d at 522.
 Nevertheless, Appellants' failure to read a policy is typically thesubject of a comparative negligence defense which is generally addressedat trial and not on a motion for summary judgment. See, Texlerv.D.O.Summers Cleaners Shirt Laundry Co. (1998), 81 Ohio St.3d 677, 681,693 N.E.2d 271 (the question as to whether plaintiffs' contributorynegligence is the proximate cause of his injury is an issue of fact forthe jury to decide pursuant to the comparative negligence provisions ofR.C. § 2315); and Collier v. Northland Swim Club(1987),35 Ohio App.3d 35, 39, 518 N.E.2d 1226 (contributory negligence isgenerally an issue of fact unless the evidence shows that plaintiff'snegligence was so extreme as a matter of law that no reasonable personcould conclude plaintiff was entitled to recover). Thus, Appelleesthemselves raise a factual issue that a jury ought to decide.Gerace-Flick v. Westfield Nat. Ins. Co., 2002-Ohio-5222, 7th Dist. App.No. 01 CO 45.
 {¶ 36} Appellants' sole assignment of error is sustained.
 {¶ 37} The September 9, 2002 Judgment Entry of the Delaware CountyCourt of Common Pleas is reversed. This matter is remanded to the trialcourt for further proceedings consistent with this opinion and the law.
By: Hoffman, P.J., Farmer, J. and Edwards, J. concur.